**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GREGORY P. JONES, SR.,

       Plaintiff,

    v.

JAMES GOMEZ; et al.,

       Defendants.

_____/

No. C 04-3034 SI (pr)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

    Gregory P. Jones, Sr., an inmate at Pelican Bay State Prison, filed this pro se civil rights action under 42 U.S.C. § 1983. Defendants have moved for summary judgment on the grounds that no triable issue of material fact exists on Jones' deliberate indifference to medical needs claim, that qualified immunity protects defendants from liability for the acts alleged in the complaint, and that defendants are entitled to judgment as a matter of law. For the reasons discussed below, the motion for summary judgment will be granted.

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

In this action, Jones contends  that defendants violated his Eighth Amendment rights by failing to provide him medical treatment for exposure to oleoresin capsicum pepper spray ("pepper spray"), which they had used on another prisoner.

The incident occurred on January 1, 2003, while Jones resided in E pod of the security housing unit at Pelican Bay.   On that date, defendants, correctional sergeant T.F. Bosley, correctional officer ("C/O") L.F. Waycott and C/O D.M. Wolf, worked at Pelican Bay.

Defendants had squirted  pepper spray at inmate Silverman while he was in his cell.  Inmate Silverman lived in a cell (#219-E) on the upper tier of the pod, and Jones lived in a cell (#117-E) on the lower tier of the same pod.  Jones' cell was two doors down from and one floor lower than Silverman's cell.   Both Silverman and Jones occupied cells that had Lexan fronts, and this plexiglass-like material covered all but the top and bottom inch of the cell front.

On the evening of January 1, 2003, sergeant Bosley and C/O Wolf entered the pod and approached inmate Silverman's cell to move him to another cell.   Silverman did not cooperate in the move and refused to submit to handcuffing.   After about 15 minutes, Bosley contacted the control booth officer, requesting that he contact the facility lieutenant and advise him of a potential cell extraction.   Upon hearing this, Silverman began to place a sheet across the front of his cell.   This violated prison regulations prohibiting  the alteration of linens and cell quarters.  More importantly, it led Bosley and Wolf to believe that Silverman was attempting to conceal efforts to defend against the anticipated cell extraction, and they thought this presented an imminent serious threat to staff and institutional safety, necessitating an immediate response. [1]

---

[1]Sergeant Bosley explained the perceived danger.  "I believed, under the circumstances, that by covering his cell door Silverman was attempting to conceal efforts to defend against the anticipated cell extraction.  With his cell concealed, Silverman could have, for example, created a 'spider web' in his cell with torn-up sheets or clothing, or could have tied his cell door shut."  Bosley Decl., ¶ 4.

The Pelican Bay written Use of Force Policy and Procedures ("Use of Force Policy") states that immediate force may be proper when, for example, inmates begin '"tearing up sheets or clothing and tying them to the bed, desk, or sink, in an effort to create a "spider web" effect.  This is a ploy by inmates to slow an extraction team during cell extractions so the inmate can successfully assault the officers.'"  Bosley Decl., ¶ 4 and Exh. A (Use of Force Policy).

United States District Court

For the Northern District of California

Bosley opened the handcuff port in Silverman's cell door and administered a one-second burst of pepper spray.  Silverman backed away from the cell door and Bosley reached through the handcuff port to remove the sheet.  Silverman continued to refuse to submit to handcuffing.  Bosley then left the area.  Jones presented evidence that Bosley left the area to obtain a gas mask because he was coughing and gagging; defendants presented evidence that Bosley left to meet with the incident commander to discuss the cell extraction and anticipated use of controlled force.

Wolf remained to monitor Silverman.  Silverman obtained another sheet and again attempted to cover his cell door.  This prompted Wolf to open the  handcuff port and administer a two-second burst of pepper spray from the same MK-9 dispenser.  Silverman dropped the sheet and moved to the back of the cell.

The evidence presented on the pepper spray usage before the cell extraction began conflicts, but not in a material way.  Jones submitted declarations describing only one squirt of pepper spray but defendants Wolf and Bosley state that they each applied one squirt of pepper spray.  Whether one squirt or two, the parties agree that defendants used pepper spray before the cell extraction began.  Jones presented evidence that about 15-20 minutes after he first heard sounds indicating pepper spray use, Bosley left the area, and then returned about 20-25 minutes later wearing a gas mask.  Jones also presented evidence that he tried to call out to Bosley for help as Bosley left the area and again upon his return 20-25 minutes later.[2]

Incident commander lieutenant M. Smelosky took steps to prepare for Silverman's

---

[2]Jones is competent to testify to the sounds he heard and the events he saw, but he is not competent to testify as to the activities he could not see or hear.

Defendants have objected to several pieces of evidence.  The objection to Silverman's statement in his declaration is overruled.  Silverman's statement that inmates were calling out to have Jones taken out of the pod because he had a heart condition and took nitroglycerin would be inadmissible hearsay if offered to show that Jones had a heart condition and took nitroglycerin, but that was not the purpose for which the statement was offered; instead, the statement was offered to show the effect of the calls for help.  The objection to Allen's statement that defendants Bosley and Wolf said "deal with it" is overruled because it was offered for the non-hearsay purpose of showing their state of mind.  The objection that Toscano's declaration shows he was incompetent to testify about the incident is overruled.  The Toscano declaration is dated January 3, 2002, a year earlier than the January 1, 2003, incident at issue.  In light of the fact that Toscano's declaration generally agrees with all other declarations regarding the incident, it is far more likely that Toscano misdated his declaration than that he had psychic abilities to predict what would occur a year after its making.  The date of the Toscano declaration appears to have been a mistake, as does the absence of pages 2 and 4 from the reply brief defendants filed.

3

extraction, including assembling a cell extraction team and ordering that the unit air exchange ventilation system be shut off.   When Silverman continued to refuse to submit to handcuffs and peaceably exit his cell, Bosley administered four bursts of pepper spray.   He also disbursed a T-16 expulsion grenade that emited pepper spray into Silverman's cell.   Silverman's resistance continued, however, and the cell extraction team forcibly removed him from his cell.   After Silverman's extraction, prison staff re-engaged the unit's ventilation system and turned it to high, and placed an exhaust fan in the unit for one hour.

The Pelican Bay Use of Force Policy provides for the use of pepper spray during cell extractions when necessary.   It mandates that inmates exposed to pepper spray receive the opportunity to decontaminate as soon as possible.  It also states,

> Inmates who are in an adjacent cell or in the general area where chemical agents are used are not considered as being exposed and do not require decontamination.   Decontamination of those inmates not directly exposed to chemical agents will be at the Incident Commander's discretion based upon obvious, physical effects of the chemical agent.
> Bosley Decl., Exh. A (Use of Force Policy), p. 14.

The parties disagree as to the pepper spray's effects on inmates located nearby at the time of its use.   Jones presented evidence that the pepper spray caused him to choke, cough and gag. He stated that he began "couching [sic], choking, and gagging so I called out and pleaded to be taken out of the pod."   Complaint, pp. 4-5.    Several inmates, including Jones, called out and requested to be removed from the pod, but no one let them out before or during the course of the cell extraction.   Jones also presented evidence that other inmates attempted to inform Bosley and other staff members that they should take Jones out of his cell because he had a heart condition, but Bosely and Wolf replied by stating "deal with it" or "not now," and did not let Jones out of his cell.

Defendants disagree with Jones' account and presented evidence that at no time during Silverman's extraction did Jones or any other inmate in E pod complain of pepper spray exposure. Additionally, they presented evidence that no inmate exhibited any obvious physical symptoms attributable to pepper spray contamination.   For summary judgment purposes, the court accepts Jones' version of the facts as true and does not credit as true defendants' statements that there

were no inmate complaints or symptoms.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Jones' claim occurred in Del Norte County, located in the Northern District.   See 28 U.S.C. §§ 84, 1391(b).   This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial.  See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense.  Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  When the defendant-movant has come forward with this evidence, the burden

United States District Court

For the Northern District of California

1   shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact

2   on the defense.

3          A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is

4   based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder

5   v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint

6   as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

7   plaintiff stated under penalty of perjury that contents were true and correct, and allegations were

8   not based purely on his belief but on his personal knowledge).   Therefore, although this Court can

9   consider Jones' verified complaint, it may not take into account any of his unsworn statements.

10  The evidence that is considered in opposition to the motion for summary judgment is limited to

11  (1) Jones' verified complaint (but not his unverified amended complaint) (2) Jones' declaration

12  in support of his amended complaint, (3) Silverman's declaration in support of Jones' amended

13  complaint, and (4) Kevin Allen's declaration in support of Jones' amended complaint.

14         The court's function on a summary judgment motion is not to make credibility

15  determinations or weigh conflicting evidence with respect to a disputed material fact.   See T.W.

16  Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).   The evidence

17  must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn

18  from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.

19

20                                **DISCUSSION**

21  A.     Deliberate Indifference to Medical Needs Claim

22         The Eighth Amendment's prohibition against cruel and unusual punishment requires that

23  prisoners not be treated inhumanely.   For a prison official to violate the Eighth Amendment, he

24  must deprive a prisoner of an objectively serious necessity, and he must possess a sufficiently

25  culpable state of mind.   See Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter,

26  501 U.S. 294, 297-298 (1991)).   Deliberate indifference to a prisoner's serious medical needs

27  violates the Eighth Amendment.    Estelle v. Gamble, 429 U.S. 97, 104 (1976).   A prison official

28  exhibits deliberate indifference when he knows of and disregards a substantial risk of serious harm

United States District Court
For the Northern District of California

6

United States District Court

For the Northern District of California

to inmate health.  Farmer, 511 U.S. at 837.  The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference.  Farmer, 511 U.S. at 837.  Evaluating a claim of deliberate indifference necessitates examining the seriousness of the prisoner's need and the nature of the defendant's response.  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992).  A serious medical need exists if failure to provide treatment could result in further significant injury or the "unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 104.

Prison officials may display deliberate indifference to medical needs if they know of the harmful effects of pepper spray and the inadequacy of ventilation methods, yet purposely refuse to provide medical care.  See Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  For example, in Clement, prison officials used pepper spray to break up a fight between two inmates and did not turn off the ventilation system before or after doing so, thereby exposing nearby inmates to pepper spray fumes.  Id. at 902.  The officials in Clement violated inmates' Eighth Amendment rights by declining to allow them to shower for four hours following the exposure.  Id. at 901-902.

Jones has not raised a triable issue of fact that defendants consciously disregarded a serious medical need or a substantial risk of serious harm to his health.   Defendants followed the Use of Force Policy and took precautionary measures to minimize inmates' exposure to pepper spray fumes.  Defendants' precautionary measures and adherence to the Use of Force Policy suggest that they lacked the requisite state of mind to establish an Eighth Amendment violation.   Defendants' precautionary steps minimized potential exposure to pepper spray for inmates other than Silverman.  Defendants turned off the unit ventilation system before extracting Silverman from his cell, when they believed pepper spray would be needed, and  afterwards re-engaged the ventilation system on a high setting and turned on a fan in order to clear the air of any lingering pepper spray vapors.  Jones does not dispute that defendants took these steps.

Defendants contend that the fact that they followed the procedures for pepper spray use and decontamination protocol contained in the Use of Force Policy precludes a finding of deliberate indifference.   Although prison officials cannot avoid liability in every case by blindly following a prison's policy because the policy itself may be infirm, following the policy here suggests a

reasonable choice to deal with pepper spray.   See California Attorneys for Criminal Justice v. Butts, 195 F.3d 1039, 1049-1050 (9th Cir. 2000).   The policy addressed the problem at hand, potential bystander exposure to pepper spray, and had been adopted pursuant to a court order.   The policy's terms had been reviewed by the court or the court's special master in the ongoing class action concerning conditions at Pelican Bay, Madrid v. Gomez, No. C90-3094 TEH.   The policy and the steps defendants took pursuant to it was one way to address the problem posed by pepper spray use in a confined area.

Although defendants used a small amount of pepper spray before the ventilation system was shut down in preparation for the expected use of pepper spray in the cell extraction, they followed the Use of Force Policy when they shut off the ventilation before using pepper spray during the extraction. Defendants also complied with the Use of Force Policy when, after the spraying had finished, they restarted the ventilation system, turned it on high, and put a fan in the unit to increase air circulation.   This precaution not only reduced any dispersion of pepper spray fumes generated during the extraction, but also addressed the pepper spray that had been administered before the ventilation system was shut down.   This suggests a reasonable course of action, rather than deliberate indifference.

Inmates located in cells near Silverman's cell were not considered to have been directly exposed to the pepper spray and thus did not require decontamination pursuant to the Use of Force Policy.   Jones was not only not in an adjacent cell, he wasn't even on the same tier. Moreover, the actual target of the pepper spray, Silverman, never found it noxious enough to comply with correctional staff's orders.   After defendants squirted him with pepper spray, Silverman still refused to submit to handcuffing and had to be forcibly extracted from his cell.   Finally, defendants squirted the pepper spray into a cell with a plexiglass front, which would have meant reduced dissipation to areas outside that cell.

Jones has presented no evidence indicating that defendants knew of possible serious injury to him. Jones states that the pepper spray caused him to cough, choke and gag, and that the defendants ignored his pleas for help.   Even assuming this to be true, as the court must at the summary judgment stage, it does not establish that defendants acted with deliberate indifference.

1    A demonstration that defendants failed to respond to Jones' requests does not alone show that

2  they deliberately ignored those requests.   Likewise, the comments allegedly made by defendants,

3  such as "deal with it" or "not now," do not support an inference of deliberate indifference because

4  they do not evince knowledge on behalf of defendants that Jones faced a serious risk of harm from

5  the pepper spray.  See Declaration of Kevin D. Allen, p. 2, Complaint, p. 5.

6        While physical harm is not always necessary to establish a constitutional violation, Jones

7  has presented no evidence that defendants' behavior caused any actual injury, suggesting that it

8  would have been reasonable for defendants to believe that Jones did not face any risk of serious

9  injury.   See McGuckin, 974 F.2d at 1060-1061.   At the time of the incident, Jones was being

10  treated for high cholesterol and chest pain of unknown origin. He was diagnosed with hypertension

11  about three months after the incident and has been on medications for his hypertension and angina.

12  A physician examined Jones two days after the incident.   Medical records for that visit and the

13  visits during the next several months do not indicate any complaint, condition or problem

14  identified by patient or doctors as related to the pepper spray exposure.   Jones had the same

15  problems before and after the incident, and there is simply no evidence that the chest pains and

16  shortness of breath of which he complains relate to the pepper spray exposure.   Jones has not

17  presented evidence to dispute defendants' contention that his discomfort was only a de minimis

18  injury,  typical of the transitory respiratory discomfort caused by pepper spray.   Finally, Jones has

19  not demonstrated any connection between an existing heart condition and an increased sensitivity

20  to pepper spray that would have demanded that prison staff take additional precautions when using

21  pepper spray in his pod.

22        In sum, Jones' evidence does not raise a triable issue of fact  that defendants knew that the

23  pepper spray exposure posed a serious risk to his health or medical needs and nevertheless

24  deliberately ignored it.   Defendants are entitled to summary judgment in their favor on his section

25  1983 claim for an Eighth Amendment violation.  See Farmer, 511 U.S. at 837.

26

27  B.    Qualified Immunity

28        The defense of qualified immunity protects government officials from civil liability for

9

conduct that does not violate clearly established constitutional rights.   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   To determine whether a defendant's conduct violated constitutional rights, the court should examine the facts in a light most favorable to the party asserting the injury. Saucier v. Katz, 533 U.S. 194, 201 (2001).

The fact that a defendant relied on training materials permitting unlawful conduct does not mean he reasonably believed his conduct to be lawful.   See California Attorneys for Criminal Justice, 195 F.3d at 1049-1050 (denying qualified immunity to defendants who interrogated suspects in violation of Miranda notwithstanding training material permitting such interrogations). However, reliance on a consent decree may shield prison officials from liability for their actions, even if the "legal landscape" at the time established the constitutional right at issue.   See Krug v. Lutz, 329 F.3d 692, 699 (9th Cir. 2003).

Because, looking at the facts in a light most favorable to Jones, the record establishes no Eighth Amendment violation, defendants prevail as a matter of law on their qualified immunity defense.   See Harlow, 457 U.S. at 818.   Furthermore, even if a constitutional violation occurred, defendants' reliance on a court-approved Use of Force Policy shields them from liability.   See Krug, 329 F.3d at 699.   It would not have been clear to a reasonable officer that following the court-approved Use of Force Policy to address bystander pepper spray concerns would have been unlawful or would have violated Jones' rights.


C.   Miscellaneous

Jones attached several miscellaneous requests to his response to defendants' motion for summary judgment.   First, he requested an extension of time until July 8, 2005 to file an amended complaint.   The Request is DENIED because Jones provided absolutely no information about why he wanted to further amend his amended complaint.   Granting the request also would have been useless, because he filed the document seeking an extension until July 8, 2005 on July 25, 2005, after the proposed extended deadline had already passed.   He did not file a proposed amended complaint by even his requested extended deadline.

Second, Jones attached a second motion for appointment of counsel to his response to the

United States District Court
For the Northern District of California

motion for summary judgment.   The motion for appointment of counsel is DENIED for the same reasons the court denied Jones' first motion for appointment of counsel.   See Order Of Service, p. 3.

Defendants filed a motion to stay discovery.   Because this court has granted defendant's summary judgment motion, the motion to stay discovery is DENIED as moot. (Docket #20.)

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket #18).   Defendants are entitled to judgment as a matter of law on the merits of the Eighth Amendment claim and on their qualified immunity defense.   Judgment will now be entered in favor of defendants and against plaintiff.   The clerk shall close the file.

IT IS SO ORDERED.

Dated: November 4, 2005

_____
SUSAN ILLSTON
United States District Judge

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          NORTHERN DISTRICT OF CALIFORNIA

10

11   GREGORY P. JONES, SR.,                          No. C 04-3034 SI (pr)

12              Plaintiff,                            **ORDER GRANTING MOTION FOR**
                                                      **SUMMARY JUDGMENT**
13       v.

14   JAMES GOMEZ; et al.,

15              Defendants.
                                        /
16   _____

17

18                                **INTRODUCTION**

19        Gregory P. Jones, Sr., an inmate at Pelican Bay State Prison, filed this pro se civil rights

20   action under 42 U.S.C. § 1983.  Defendants have moved for summary judgment on the grounds that

21   no triable issue of material fact exists on Jones' deliberate indifference to medical needs claim,

22   that qualified immunity protects defendants from liability for the acts alleged in the complaint,

23   and that defendants are entitled to judgment as a matter of law.  For the reasons discussed below,

24   the motion for summary judgment will be granted.

25

26

27

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

**BACKGROUND**

The following facts are undisputed unless otherwise noted.

In this action, Jones contends that defendants violated his Eighth Amendment rights by failing to provide him medical treatment for exposure to oleoresin capsicum pepper spray ("pepper spray"), which they had used on another prisoner.

The incident occurred on January 1, 2003, while Jones resided in E pod of the security housing unit at Pelican Bay. On that date, defendants, correctional sergeant T.F. Bosley, correctional officer ("C/O") L.F. Waycott and C/O D.M. Wolf, worked at Pelican Bay.

Defendants had squirted pepper spray at inmate Silverman while he was in his cell. Inmate Silverman lived in a cell (#219-E) on the upper tier of the pod, and Jones lived in a cell (#117-E) on the lower tier of the same pod. Jones' cell was two doors down from and one floor lower than Silverman's cell. Both Silverman and Jones occupied cells that had Lexan fronts, and this plexiglass-like material covered all but the top and bottom inch of the cell front.

On the evening of January 1, 2003, sergeant Bosley and C/O Wolf entered the pod and approached inmate Silverman's cell to move him to another cell. Silverman did not cooperate in the move and refused to submit to handcuffing. After about 15 minutes, Bosley contacted the control booth officer, requesting that he contact the facility lieutenant and advise him of a potential cell extraction. Upon hearing this, Silverman began to place a sheet across the front of his cell. This violated prison regulations prohibiting the alteration of linens and cell quarters. More importantly, it led Bosley and Wolf to believe that Silverman was attempting to conceal efforts to defend against the anticipated cell extraction, and they thought this presented an imminent serious threat to staff and institutional safety, necessitating an immediate response. [1]

---

[1]Sergeant Bosley explained the perceived danger. "I believed, under the circumstances, that by covering his cell door Silverman was attempting to conceal efforts to defend against the anticipated cell extraction. With his cell concealed, Silverman could have, for example, created a 'spider web' in his cell with torn-up sheets or clothing, or could have tied his cell door shut." Bosley Decl., ¶ 4.

The Pelican Bay written Use of Force Policy and Procedures ("Use of Force Policy") states that immediate force may be proper when, for example, inmates begin "'tearing up sheets or clothing and tying them to the bed, desk, or sink, in an effort to create a "spider web" effect. This is a ploy by inmates to slow an extraction team during cell extractions so the inmate can successfully assault the officers.'" Bosley Decl., ¶ 4 and Exh. A (Use of Force Policy).

**United States District Court**

For the Northern District of California

Bosley opened the handcuff port in Silverman's cell door and administered a one-second burst of pepper spray. Silverman backed away from the cell door and Bosley reached through the handcuff port to remove the sheet. Silverman continued to refuse to submit to handcuffing. Bosley then left the area. Jones presented evidence that Bosley left the area to obtain a gas mask because he was coughing and gagging; defendants presented evidence that Bosley left to meet with the incident commander to discuss the cell extraction and anticipated use of controlled force.

Wolf remained to monitor Silverman. Silverman obtained another sheet and again attempted to cover his cell door. This prompted Wolf to open the handcuff port and administer a two-second burst of pepper spray from the same MK-9 dispenser. Silverman dropped the sheet and moved to the back of the cell.

The evidence presented on the pepper spray usage before the cell extraction began conflicts, but not in a material way. Jones submitted declarations describing only one squirt of pepper spray but defendants Wolf and Bosley state that they each applied one squirt of pepper spray. Whether one squirt or two, the parties agree that defendants used pepper spray before the cell extraction began. Jones presented evidence that about 15-20 minutes after he first heard sounds indicating pepper spray use, Bosley left the area, and then returned about 20-25 minutes later wearing a gas mask. Jones also presented evidence that he tried to call out to Bosley for help as Bosley left the area and again upon his return 20-25 minutes later.[2]

Incident commander lieutenant M. Smelosky took steps to prepare for Silverman's

---

[2]Jones is competent to testify to the sounds he heard and the events he saw, but he is not competent to testify as to the activities he could not see or hear.

Defendants have objected to several pieces of evidence. The objection to Silverman's statement in his declaration is overruled. Silverman's statement that inmates were calling out to have Jones taken out of the pod because he had a heart condition and took nitroglycerin would be inadmissible hearsay if offered to show that Jones had a heart condition and took nitroglycerin, but that was not the purpose for which the statement was offered; instead, the statement was offered to show the effect of the calls for help. The objection to Allen's statement that defendants Bosley and Wolf said "deal with it" is overruled because it was offered for the non-hearsay purpose of showing their state of mind. The objection that Toscano's declaration shows he was incompetent to testify about the incident is overruled. The Toscano declaration is dated January 3, 2002, a year earlier than the January 1, 2003, incident at issue. In light of the fact that Toscano's declaration generally agrees with all other declarations regarding the incident, it is far more likely that Toscano misdated his declaration than that he had psychic abilities to predict what would occur a year after its making. The date of the Toscano declaration appears to have been a mistake, as does the absence of pages 2 and 4 from the reply brief defendants filed.

extraction, including assembling a cell extraction team and ordering that the unit air exchange ventilation system be shut off.  When Silverman continued to refuse to submit to handcuffs and peaceably exit his cell, Bosley administered four bursts of pepper spray.  He also disbursed a T-16 expulsion grenade that emited pepper spray into Silverman's cell.  Silverman's resistance continued, however, and the cell extraction team forcibly removed him from his cell.  After Silverman's extraction, prison staff re-engaged the unit's ventilation system and turned it to high, and placed an exhaust fan in the unit for one hour.

The Pelican Bay Use of Force Policy provides for the use of pepper spray during cell extractions when necessary.  It mandates that inmates exposed to pepper spray receive the opportunity to decontaminate as soon as possible.  It also states,

> Inmates who are in an adjacent cell or in the general area where chemical agents are used are not considered as being exposed and do not require decontamination.  Decontamination of those inmates not directly exposed to chemical agents will be at the Incident Commander's discretion based upon obvious, physical effects of the chemical agent.
> Bosley Decl., Exh. A (Use of Force Policy), p. 14.

The parties disagree as to the pepper spray's effects on inmates located nearby at the time of its use.  Jones presented evidence that the pepper spray caused him to choke, cough and gag. He stated that he began "couching [sic], choking, and gagging so I called out and pleaded to be taken out of the pod."  Complaint, pp. 4-5.   Several inmates, including Jones, called out and requested to be removed from the pod, but no one let them out before or during the course of the cell extraction.  Jones also presented evidence that other inmates attempted to inform Bosley and other staff members that they should take Jones out of his cell because he had a heart condition, but Bosely and Wolf replied by stating "deal with it" or "not now," and did not let Jones out of his cell.

Defendants disagree with Jones' account and presented evidence that at no time during Silverman's extraction did Jones or any other inmate in E pod complain of pepper spray exposure. Additionally, they presented evidence that no inmate exhibited any obvious physical symptoms attributable to pepper spray contamination.  For summary judgment purposes, the court accepts Jones' version of the facts as true and does not credit as true defendants' statements that there

1   were no inmate complaints or symptoms.

2

3                          **VENUE AND JURISDICTION**

4        Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the

5   events or omissions giving rise to Jones' claim occurred in Del Norte County, located in the

6   Northern District.   See 28 U.S.C. §§ 84, 1391(b).   This Court has federal question jurisdiction

7   over this action under 42 U.S.C. § 1983.   See 28 U.S.C. § 1331.

8

9              **LEGAL STANDARD FOR SUMMARY JUDGMENT**

10        The court will grant summary judgment "against a party who fails to make a showing

11   sufficient to establish the existence of an element essential to that party's case, and on which that

12   party will bear the burden of proof at trial . . . since a complete failure of proof concerning an

13   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

14   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc.,

15   477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under

16   governing law, and a dispute about a material fact is genuine "if the evidence is such that a

17   reasonable jury could return a verdict for the nonmoving party.")

18        Generally, the moving party bears the initial burden of identifying those portions of the

19   record which demonstrate the absence of a genuine issue of material fact.   The burden then shifts

20   to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the

21   'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing

22   that there is a genuine issue for trial.'"   Celotex, 477 U.S. at 324 (citations omitted).

23        Where, as is the situation with defendants' qualified immunity defense, the moving party

24   bears the burden of proof at trial, he must come forward with evidence which would entitle him

25   to a directed verdict if the evidence went uncontroverted at trial.   See Houghton v. Smith, 965 F.2d

26   1532, 1536 (9th Cir. 1992).   He must establish the absence of a genuine issue of fact on each

27   issue material to his affirmative defense.   Id. at 1537; see also Anderson v. Liberty Lobby, Inc.,

28   477 U.S. at 248.   When the defendant-movant has come forward with this evidence, the burden

5

shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Therefore, although this Court can consider Jones' verified complaint, it may not take into account any of his unsworn statements.  The evidence that is considered in opposition to the motion for summary judgment is limited to (1) Jones' verified complaint (but not his unverified amended complaint) (2) Jones' declaration in support of his amended complaint, (3) Silverman's declaration in support of Jones' amended complaint, and (4) Kevin Allen's declaration in support of Jones' amended complaint.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.

**DISCUSSION**

A.     Deliberate Indifference to Medical Needs Claim

The Eighth Amendment's prohibition against cruel and unusual punishment requires that prisoners not be treated inhumanely.  For a prison official to violate the Eighth Amendment, he must deprive a prisoner of an objectively serious necessity, and he must possess a sufficiently culpable state of mind.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 297-298 (1991)).  Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  A prison official exhibits deliberate indifference when he knows of and disregards a substantial risk of serious harm

to inmate health.  Farmer, 511 U.S. at 837.  The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference.  Farmer, 511 U.S. at 837.  Evaluating a claim of deliberate indifference necessitates examining the seriousness of the prisoner's need and the nature of the defendant's response.  See McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992).  A serious medical need exists if failure to provide treatment could result in further significant injury or the "unnecessary and wanton infliction of pain."  Estelle, 429 U.S. at 104.

Prison officials may display deliberate indifference to medical needs if they know of the harmful effects of pepper spray and the inadequacy of ventilation methods, yet purposely refuse to provide medical care.  See Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).  For example, in Clement, prison officials used pepper spray to break up a fight between two inmates and did not turn off the ventilation system before or after doing so, thereby exposing nearby inmates to pepper spray fumes.  Id. at 902.  The officials in Clement violated inmates' Eighth Amendment rights by declining to allow them to shower for four hours following the exposure.  Id. at 901-902.

Jones has not raised a triable issue of fact that defendants consciously disregarded a serious medical need or a substantial risk of serious harm to his health.  Defendants followed the Use of Force Policy and took precautionary measures to minimize inmates' exposure to pepper spray fumes.  Defendants' precautionary measures and adherence to the Use of Force Policy suggest that they lacked the requisite state of mind to establish an Eighth Amendment violation.  Defendants' precautionary steps minimized potential exposure to pepper spray for inmates other than Silverman.  Defendants turned off the unit ventilation system before extracting Silverman from his cell, when they believed pepper spray would be needed, and  afterwards re-engaged the ventilation system on a high setting and turned on a fan in order to clear the air of any lingering pepper spray vapors.  Jones does not dispute that defendants took these steps.

Defendants contend that the fact that they followed the procedures for pepper spray use and decontamination protocol contained in the Use of Force Policy precludes a finding of deliberate indifference.   Although prison officials cannot avoid liability in every case by blindly following a prison's policy because the policy itself may be infirm, following the policy here suggests a

1  reasonable choice to deal with pepper spray.   See California Attorneys for Criminal Justice v.

2  Butts, 195 F.3d 1039, 1049-1050 (9th Cir. 2000).   The policy addressed the problem at hand,

3  potential bystander exposure to pepper spray, and had been adopted pursuant to a court order.   The

4  policy's terms had been reviewed by the court or the court's special master in the ongoing class

5  action concerning conditions at Pelican Bay, Madrid v. Gomez, No. C90-3094 TEH.    The policy

6  and the steps defendants took pursuant to it was one way to address the problem posed by pepper

7  spray use in a confined area.

8        Although defendants used a small amount of pepper spray before the ventilation system was

9  shut down in preparation for the expected use of pepper spray in the cell extraction, they followed

10 the Use of Force Policy when they shut off the ventilation before using pepper spray during the

11 extraction. Defendants also complied with the Use of Force Policy when, after the spraying had

12 finished, they restarted the ventilation system, turned it on high, and put a fan in the unit to increase

13 air circulation.   This precaution not only reduced any dispersion of pepper spray fumes generated

14 during the extraction, but also addressed the pepper spray that had been administered before the

15 ventilation system was shut down.   This suggests a reasonable course of action, rather than

16 deliberate indifference.

17       Inmates located in cells near Silverman's cell were not considered to have been directly

18 exposed to the pepper spray and thus did not require decontamination pursuant to the Use of Force

19 Policy.  Jones was not only not in an adjacent cell, he wasn't even on the same tier. Moreover, the

20 actual target of the pepper spray, Silverman, never found it noxious enough to comply with

21 correctional staff's orders.    After defendants squirted him with pepper spray, Silverman still

22 refused to submit to handcuffing and had to be forcibly extracted from his cell.  Finally, defendants

23 squirted the pepper spray into a cell with a plexiglass front, which would have meant reduced

24 dissipation to areas outside that cell.

25       Jones has presented no evidence indicating that defendants knew of possible serious injury

26 to him. Jones states that the pepper spray caused him to cough, choke and gag, and that the

27 defendants ignored his pleas for help.   Even assuming this to be true, as the court must at the

28 summary judgment stage, it does not establish that defendants acted with deliberate indifference.

United States District Court

For the Northern District of California

1   A demonstration that defendants failed to respond to Jones' requests does not alone show that

2   they deliberately ignored those requests.   Likewise, the comments allegedly made by defendants,

3   such as "deal with it" or "not now," do not support an inference of deliberate indifference because

4   they do not evince knowledge on behalf of defendants that Jones faced a serious risk of harm from

5   the pepper spray.  See Declaration of Kevin D. Allen, p. 2, Complaint, p. 5.

6        While physical harm is not always necessary to establish a constitutional violation, Jones

7   has presented no evidence that defendants' behavior caused any actual injury, suggesting that it

8   would have been reasonable for defendants to believe that Jones did not face any risk of serious

9   injury.   See McGuckin, 974 F.2d at 1060-1061.   At the time of the incident, Jones was being

10  treated for high cholesterol and chest pain of unknown origin. He was diagnosed with hypertension

11  about three months after the incident and has been on medications for his hypertension and angina.

12  A physician examined Jones two days after the incident.   Medical records for that visit and the

13  visits during the next several months do not indicate any complaint, condition or problem

14  identified by patient or doctors as related to the pepper spray exposure.   Jones had the same

15  problems before and after the incident, and there is simply no evidence that the chest pains and

16  shortness of breath of which he complains relate to the pepper spray exposure.   Jones has not

17  presented evidence to dispute defendants' contention that his discomfort was only a de minimis

18  injury,  typical of the transitory respiratory discomfort caused by pepper spray.   Finally, Jones has

19  not demonstrated any connection between an existing heart condition and an increased sensitivity

20  to pepper spray that would have demanded that prison staff take additional precautions when using

21  pepper spray in his pod.

22       In sum, Jones' evidence does not raise a triable issue of fact  that defendants knew that the

23  pepper spray exposure posed a serious risk to his health or medical needs and nevertheless

24  deliberately ignored it.   Defendants are entitled to summary judgment in their favor on his section

25  1983 claim for an Eighth Amendment violation.  See Farmer, 511 U.S. at 837.

26

27  B.    Qualified Immunity

28       The defense of qualified immunity protects government officials from civil liability for

9

conduct that does not violate clearly established constitutional rights.   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   To determine whether a defendant's conduct violated constitutional rights, the court should examine the facts in a light most favorable to the party asserting the injury. Saucier v. Katz, 533 U.S. 194, 201 (2001).

The fact that a defendant relied on training materials permitting unlawful conduct does not mean he reasonably believed his conduct to be lawful.   See California Attorneys for Criminal Justice, 195 F.3d at 1049-1050 (denying qualified immunity to defendants who interrogated suspects in violation of Miranda notwithstanding training material permitting such interrogations). However, reliance on a consent decree may shield prison officials from liability for their actions, even if the "legal landscape" at the time established the constitutional right at issue.   See Krug v. Lutz, 329 F.3d 692, 699 (9th Cir. 2003).

Because, looking at the facts in a light most favorable to Jones, the record establishes no Eighth Amendment violation, defendants prevail as a matter of law on their qualified immunity defense.   See Harlow, 457 U.S. at 818.   Furthermore, even if a constitutional violation occurred, defendants' reliance on a court-approved Use of Force Policy shields them from liability.   See Krug, 329 F.3d at 699.   It would not have been clear to a reasonable officer that following the court-approved Use of Force Policy to address bystander pepper spray concerns would have been unlawful or would have violated Jones' rights.

C.   Miscellaneous

Jones attached several miscellaneous requests to his response to defendants' motion for summary judgment.   First, he requested an extension of time until July 8, 2005 to file an amended complaint.   The Request is DENIED because Jones provided absolutely no information about why he wanted to further amend his amended complaint.   Granting the request also would have been useless, because he filed the document seeking an extension until July 8, 2005 on July 25, 2005, after the proposed extended deadline had already passed.   He did not file a proposed amended complaint by even his requested extended deadline.

Second, Jones attached a second motion for appointment of counsel to his response to the

United States District Court
For the Northern District of California

motion for summary judgment.   The motion for appointment of counsel is DENIED for the same

reasons the court denied Jones' first motion for appointment of counsel.   <u>See</u> Order Of Service,

p. 3.

Defendants filed a motion to stay discovery.   Because this court has granted defendant's

summary judgment motion, the motion to stay discovery is DENIED as moot. (Docket #20.)

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

(Docket #18).   Defendants are entitled to judgment as a matter of law on the merits of the Eighth

Amendment claim and on their qualified immunity defense.   Judgment will now be entered in favor

of defendants and against plaintiff.   The clerk shall close the file.

IT IS SO ORDERED.

Dated: November 4, 2005

_____
SUSAN ILLSTON
United States District Judge

11